O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECELIA V. M.,<br><br>    Plaintiff,<br><br>v.<br><br>ANDREW M. SAUL, Commissioner of Social Security,<br><br>    Defendant. | Case No. 5:19-cv-1678-KES<br><br>MEMORANDUM OPINION AND ORDER |

## I.
## PROCEDURAL BACKGROUND

Plaintiff Cecelia M. ("Plaintiff") applied for Titles II and XVI social security disability benefits in 2016, alleging a disability onset date of June 8, 2014, due to a work injury that caused lower back pain. Administrative Record ("AR") 42-43, 46, 246-48. On September 26, 2018, an Administrative Law Judge ("ALJ") conducted a hearing that Plaintiff attended along with her attorney. AR 35-64. On November 2, 2018, the ALJ issued an unfavorable decision. AR 13-29. The ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "fibromyalgia; bilateral carpal tunnel syndrome; non-insulin dependent diabetes with polyneuropathy; degenerative disc disease of the lumbar

spine; cervical dysplasia; cervicobrachial syndrome; cervical spondylosis with radiculopathy; right hip greater trochanteric bursitis; and right iliotibial band syndrome." AR 15. Despite these impairments, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform "light" work with some limitations on postural activities and the ability to change between sitting and standing twice per hour. AR 20. Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform her past relevant work as an appointment clerk or claims clerk. AR 28. The ALJ concluded that Plaintiff was not disabled. AR 29.

## II.
## ISSUES PRESENTED

<u>Issue One</u>: Whether the ALJ properly evaluated the medial evidence. (Dkt. 18, Joint Stipulation ["JS"] at 3.) First, Plaintiff contends that the ALJ erred by giving "little weight" to the opinions of the state agency psychological consultant, Dr. Alan Harris, and giving "great weight" to the opinions of consultative examiner, psychologist Dr. Christopher Cooper. (JS at 6.) Second, Plaintiff contends that the ALJ erred by giving "little weight" to the opinions of Plaintiff's treating physician, Dr. Brent Pratley. (JS at 7.)

<u>Issue Two</u>: Whether the ALJ properly evaluated Plaintiff's subjective symptom testimony. (JS at 3, 14.)

## III.
## DISCUSSION

A.  **ISSUE ONE: The ALJ's Evaluation of the Medical Evidence.**

   1.  **Summary of Dr. Cooper's Opinions.**

On September 11, 2016, Plaintiff underwent a psychological evaluation by Dr. Cooper. AR 1144-52. Plaintiff drove alone approximately 40 miles to the appointment. AR 1144. She reported a history of anxiety and depression causing memory and concentration problems. AR 1145. She was currently attending

2

1  psychotherapy, but she was not taking any psychotropic medication. Id.

2  She displayed a coherent thought process with no abnormal thought content.
3  AR 1147. She spoke clearly with normal rate and volume. Id. Her mood,
4  however, was sad and she was tearful; she expressed feelings of hopelessness. Id.

5  Dr. Cooper assessed that she appeared to be of average intelligence per the
6  testing he administered and his observations. AR 1147. She correctly performed
7  the tests measuring concentration and calculation. AR 1148. He assessed that her
8  abstract thinking, judgment, insight, attention, and concentration were intact. Id.
9  She could not recall any of the 3 previously-identified items after 5 minutes, but
10 she could recall how President Kennedy died. AR 1147.

11 Regarding her daily activities, Plaintiff reported that she was able to drive,
12 do personal self-care, go out alone, handle her own finances, maintain friendships,
13 go shopping, run errands, and complete household chores, although with difficulty
14 due to physical pain. AR 1146, 1151.

15 Dr. Cooper administered tests including an IQ test ("WAIS-IV") and
16 Wechsler Memory Scales 4th Edition ("WMS-IV"). AR 1144, 1149-50. He
17 assessed her IQ score as 93, placing her in the "average" range of intelligence. AR
18 1149. On the memory test, Plaintiff's scores ranged between 41 and 52, while an
19 average score on this test is 100. AR 1150. These results caused Dr. Cooper to
20 conclude that she "functions in the extremely low range in memory and recall." Id.
21 Dr. Cooper opined that Plaintiff used her best efforts during the testing, but her
22 "efforts slowed … which may[ be] a function of her depressive symptoms." AR
23 1151. He diagnosed her as suffering from a depressive disorder with a Global
24 Assessment of Functioning ("GAF") score of 60. Id.

25 Among other things, he concluded that she had "no impairment"
26 understanding, remembering, and carrying out simple instructions, "mild
27 impairment" doing complex instructions, and "mild impairment" maintaining
28 attention, persistence, and pace. AR 1152.

**2. Summary of Dr. Harris's Opinions.**

On September 23, 2016 (i.e., shortly after Dr. Cooper's report), state agency psychologist Dr. Alan Harris considered Plaintiff's mental RFC. The Disability Determination Explanation ("DDE") summarized Dr. Cooper's report and other evidence relevant to Plaintiff's mental health. AR 92-93. The other evidence included (1) a medical appointment noting a "sad" affect and depressed mood after reporting a relationship break-up (AR 93), and (2) activities of daily living as reported to Dr. Cooper and in a Function Report[1] (AR 280-88). Under "Notes/Questions to MCs" the DDE states:

> This claimant was mostly wnl [within normal limits], but her WMS-IV scores were extremely low. However, the [claimant] is independent in her adls [activities of daily living], was able to drive 40 miles to the appointment and her effort was noted to slow during testing, possibly related to her depressive symptoms. Given that her pace is slowed by her depression, as indicated by her WMS-IV scores, it would be in my judgment to limit her to no more than simple, repetitive tasks over a normal 40-hour workweek. Please advise.

AR 92. The DDE finds her "affective disorder" to be a "severe" impairment causing "moderate" difficulties maintaining concentration, persistence or pace. AR 92-93. Under "PRT [psychiatric review technique] – Additional Explanation," Dr. Harris wrote as follows:

---

[1] Per her function report, she could use a computer, use the reminder function on her cell phone, drive, and manage her medications. AR 280-83. She went shopping every week and paid bills. AR 283. She checked boxes indicating she has trouble with memory and concentration, but not with understanding or following instructions. AR 285. She rated herself as "good" at following spoken instructions. Id.

>WMS scores are not considered valid. Either depression affected effort or [claimant] chose to not exert effort as radically inconsistent with other evidence and [claimant's] self report that she is able to drive, go out alone, manage finances, follow instruct[ions]. Per SSA guidelines MSS [medical source statement] of CE [consultative examiner] given great weight as consistent with adls and MER [medical evidence of record]. [Claimant] completes adls within phys[ical] limitations, relates adeq[uately]. Condition present but not severe or disabling. See mrfc [mental residual functional capacity].

AR 93.

In the MRFC portion of the DDE, Dr. Harris found that Plaintiff was "not significantly limited" in her ability to remember "very short and simple" instructions, locations, and work-like procedures. AR 98. She was "moderately limited" at understanding and carrying out "detailed" instructions. AR 98-99. While she was "moderately limited" in maintaining concentration, persistence, and pace, she could "maintain sufficient attention and concentration to consistently perform simple tasks and maintain a regular schedule." AR 99. He concluded, "claimant is able to meet the mental demands of a simple vocation on a sustained basis despite the limitations resulting from any impairment." AR 100.

### 3. The ALJ's Decision.

The ALJ determined that Plaintiff's depressive disorder was not a severe impairment. AR 17. The ALJ found that Plaintiff had only mild memory limitations and mild limitations maintaining concentration persistence and pace. AR 17-18. As supporting evidence, the ALJ cited Dr. Cooper's report, treating records from 2016 to 2018, and "other evidence detailed in this decision." Id. Later in the decision, the ALJ discussed Plaintiff's mental health while giving reasons to discount the lay testimony of Plaintiff's mother-in-law, who reported that Plaintiff had trouble concentrating, understanding, and completing tasks. AR

27 (citing AR 276).  The ALJ discounted this testimony, in part, because it was inconsistent with Plaintiff's activities which included driving and shopping independently.  AR 27.

The ALJ gave Dr. Cooper's opinions "great weight" because they were "consistent with the other evidence of record as a whole including the medical evidence demonstrating the claimant's persistent symptoms remained generally stable at no worse than a mild level with appropriate conservative treatment and the absence of more significant positive objective clinical or diagnostic findings pertaining to a mental impairment."  AR 19.  The ALJ gave "little weight" to Dr. Harris's opinion that Plaintiff suffered from a "severe" mental impairment.  Id.  The ALJ found it "inconsistent" with the other evidence, citing Dr. Cooper's report.  Id.

In the RFC, the ALJ did not limit Plaintiff to simple, repetitive, or slow-paced tasks.  AR 20.

**4. Analysis of Claimed Error.**

First, Plaintiff argues that it was legal error to weigh the opinions of Drs. Cooper and Harris differently since both relied on Dr. Cooper's testing and observations. (JS at 6.)  While both doctors did rely on Dr. Cooper's testing and observations, they reached different conclusions.  Dr. Cooper opined that Plaintiff had no more that "mild" functional limitations (AR 1152) while Dr. Harris assessed some "moderate" limitations (AR 98-99).  The ALJ was entitled to give more weight to the opinions of the doctor who interacted with Plaintiff and administered the tests.  See 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) (noting that generally more weight is afforded to the medical opinion of an examining source over a non-examining source).

Second, Plaintiff argues that the ALJ erred by not incorporating some limitation into the RFC to address Plaintiff's depression, regardless of whether it was a "severe" impairment. (JS at 13.)  Plaintiff argues that because she scored so

poorly on the WMS-IV testing, she should have been limited to "simple" work, consistent with Dr. Harris's opinions and the DDE. (JS at 6, 12.)

In the social security context, "simple" work corresponds to work with a reasoning level of 1 or 2 on a scale of 1 to 6, with 1 being the lowest rating. Zavalin v. Colvin, 778 F.3d 842, 846-47 (9th Cir. 2015). The Dictionary of Occupational Titles ("DOT") rates Plaintiff's past relevant jobs as requiring Level 3 reasoning level, one level above "simple" work. See DOT 237.367-010 and 205.367-018. Level 3 reasoning requires workers to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." Id. In contrast, Level 2 reasoning requires workers to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "deal with problems involving a few concrete variables in or from standardized situations." Zavalin, 778 F.3d at 847.

Here, Dr. Cooper opined that Plaintiff did not need to be limited to simple work. AR 1152. His opinion, coupled with other evidence in the record that Plaintiff was able to drive, use a computer, set reminders on her cellphone, manage her own finances, and shop independently, are substantial evidence supporting the ALJ's assessment that Plaintiff was mentally capable of more than "simple" work tasks.

**5.    Summary of Dr. Pratley's Opinions.**

Dr. Pratley of Keystone Medical Group treated Plaintiff in connection with her workers' compensation claim. On January 26, 2015, Keystone chiropractor Dr. Gary Weessies prepared an Initial Qualified Functional Capacity Evaluation ("QFCE") for Dr. Pratley. AR 381-89. Per the QFCE, Plaintiff could lift and carry no more than 2 pounds, but she could push or pull as much as 130 pounds. AR 381. She could spend 15 minutes sitting, 14 minutes standing, and 6 minutes walking. Id. The QFCE explains that Plaintiff was asked to do some of these

7

activities, and the maximum numbers stated for sitting, standing, walking, and lifting represent when she stopped or declined to do more. AR 383-87. The QFCE states that Plaintiff can stoop, crouch, crawl, and kneel, but she cannot "seize an object with either hand in many directions" and her pinch strength was 0. AR 385-87. The QFCE reported that Plaintiff could perform the following activities, but with pain: "lift heavy items, stand, walk, shop for groceries, climb stairs, [and] drive a car …." AR 388.

A few weeks later on February 11, 2015, Dr. Pratley wrote a progress report opining that Plaintiff suffered from lumbar spondylosis, bursitis of the hips, chondromalacia[2] of the right knee, and plantar fasciitis of both feet. AR 317. He had prescribed topical pain creams and acupuncture, but he stopped her acupuncture referral after four sessions with no improvement. AR 317-18. Her treatment plan included home exercises. AR 318. He opined that she could return to work if restricted against (1) standing, walking, or sitting for longer than 20 minutes without a 5-minute break, (2) lifting more than 10 pounds, (3) kneeling or squatting, and (4) reaching overhead. AR 318, 322.

### 6. The ALJ's Decision.

The ALJ gave Dr. Pratley's opinions "little weight" citing four reasons: (1) they contain inadequate supporting explanations, (2) they fail to reference "sufficient medically acceptable objective clinical or diagnostic findings," (3) they are not supported by other objective evidence in the record, (4) they are "inconsistent with evidence from other medical and nonmedical sources," and (5) Dr. Pratley did not have access to later treatment records that the state agency consultant reviewed. AR 26-27.

It is undisputed that Dr. Pratley's opinions were contradicted. See, e.g., AR 1139 (consultative examiner Dr. Bernabe's opinion that Plaintiff could walk, stand,

---

[2] This condition is also known as runner's knee.

1  and sit without limitations).  The ALJ was therefore required to provide "specific
2  and legitimate" reasons for discounting Dr. Pratley's opinions, supported by
3  substantial evidence.  Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989).

**7. Analysis of Claimed Error.**

Plaintiff argues that reasons 1, 2, and 3 are all the same reason (i.e., that Dr. Pratley's opinions lack objective support) and that the reason is unsupported.  (JS at 7.)  Plaintiff argues that Dr. Pratley's opinions are supported by spinal MRIs showing conditions that could cause back pain, grip strength testing indicating diminished strength, and a nerve conduction study that showed carpal tunnel syndrome.  (JS at 7-8.)

The testing cited by Plaintiff does not explain on what basis Dr. Pratley diagnosed Plaintiff as suffering from hip bursitis, chondromalacia, or plantar fasciitis.  None of these conditions relate to Plaintiff's arms or shoulders, so the conditions would not be diagnosed through grip strength testing or nerve conduction studies.  The conditions also appear unrelated to Dr. Pratley's restrictions against overhead reaching.  Much of Dr. Weessies's QFCE was not based on objective evidence (such as imaging studies or a physical examination of Plaintiff) but rather expressly relied on Plaintiff's subjective self-reporting of her limitations.  See, e.g., AR 384, 389 (Plaintiff "walked for 6 minutes[,]" so he opined that she could not walk for more than 6 minutes.).  Dr. Pratley, in turn, did not base his opinions on the QFCE (finding, for example, that Plaintiff could lift 10 pounds rather than 2, walk for 20 minutes rather than 6, and could not kneel despite Dr. Weessies's finding that she could kneel (see AR 318)), but he fails to explain on what basis he rejected the QFCE prepared by his own office just a few weeks earlier and then formulated different opinions.  Thus, the ALJ cited specific, legitimate reasons supported by the record for discounting Dr. Pratley's opinions.

**B.    ISSUE TWO: Subjective Symptom Testimony.**

**1.    Legal Standard.**

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (citation omitted). "Second, if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" Id. (citation omitted). If the ALJ's assessment "is supported by substantial evidence in the record, [courts] may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

**2.    The ALJ's Reasoning.**

The ALJ began his consideration of Plaintiff's subjective symptom testimony by reciting the two-step process required by law. AR 20-21. The ALJ then summarized Plaintiff's testimony. AR 21. The ALJ determined that Plaintiff satisfied the first step, i.e., her medically determinable impairments could reasonably be expected to cause the alleged symptoms of pain, mental health symptoms, and mobility difficulties. Id. At step two, however, the ALJ found that Plaintiff's statements about "the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." AR 21-22.

As a first reason, the ALJ gave examples of how Plaintiff's testimony was inconsistent with statements about her subjective complaints in her medical records. The ALJ cited several specific inconsistencies. First, the ALJ noted that at the September 2018 hearing, Plaintiff testified she had significant back pain.

AR 21 (referencing AR 46-47 (Plaintiff could not continue working in 2014 because her "lower back was hurting so much" and she had pain in her "upper back by [her] neck" that was "extreme" and "constant.")). The ALJ contrasted this testimony with records from a November 2015 cardiology appointment saying "negative for … back pain" and "Pt states no symptoms but just [diagnosed] with fibromyalgia." AR 21 (referencing AR 535).

Second, the ALJ noted that Plaintiff testified she had trouble walking. AR 21 (referencing AR 42 (Plaintiff stopped working in 2014 because "I just couldn't walk anymore, it was just extreme pain")); see also AR 285 (Per 2016 function report, she can walk for "10-15 min" before needing to rest). The ALJ contrasted this with the same 2015 cardiology record that says, "Walks for 30 minutes few times a week without symptoms." AR 21 (referencing AR 535).

Third, the ALJ noted that Plaintiff complained of significant fibromyalgia pain, weakness, and fatigue. AR 21 (referencing AR 51 (Plaintiff only gets 5 hours of sleep per night)); see also AR 280 ("I get very tired and need to rest throughout the day."). The ALJ contrasted this testimony with records from an October 2015 pain management appointment which said that Plaintiff "denies fatigue, tiredness, or insomnia" and was "comfortable taking current Norco three per day" and not trying "more typical medications for fibromyalgia[.]" AR 21 (referencing AR 734-36).

Fourth, Plaintiff complained of peripheral neuropathy and radiating pain. AR 21-22 (referring to AR 50 ("I have been known to drop dishes because I just can't hold onto them.")) and AR 285 (checking box to indicate her condition affects "using hands"). August 2015 testing of her upper extremities, however, revealed carpal tunnel syndrome but "no evidence for peripheral neuropathy or radiculopathy." AR 812.

Fifth, the ALJ again referred to Plaintiff's testimony that she has difficulty walking because of pain. AR 22. The ALJ contrasted this with medical records

11

indicating that Plaintiff had a normal gait, including:

- 11/17/15: Plaintiff "walks for 30 minutes few times a week[.]" AR 535.
- 9/9/16: Plaintiff displayed "normal" gait and could walk on tiptoes and heels without difficulty. AR 1137.
- 5/9/17: Plaintiff had "normal" gait but "tired looking and like in pain." AR 1402.
- 2/5/18: Plaintiff had "normal" gait. AR 1333.

As a second reason, the ALJ found that Plaintiff's testimony was inconsistent with certain objective medical testing. AR 22.

As a third reason, the ALJ found that Plaintiff had failed to follow recommended treatment. Id. As supporting evidence, the ALJ cited Plaintiff's decision to decline a carpal tunnel syndrome injection and "typical" medication for fibromyalgia. Id. (citing AR 734, 736).

### 3. Analysis of Claimed Error.

Regarding the inconsistencies identified by the ALJ in support of the ALJ's first reason, Plaintiff argues that the ALJ is "splitting hairs and cherry-pick[ing] from the evidence" to support a desired outcome. (JS at 16.) Plaintiff misapplies this doctrine. To support a finding that a claimant has made inconsistent statements about his/her subjective symptoms, the ALJ must comb through the evidence and cite specific examples, which is exactly what the ALJ did. The fact that Plaintiff told Dr. Weessies in 2015 in the course of her workers' compensation claim that she could only walk 6 minutes (AR 381-89) and told the SSA in 2016 that she could only walk 10-15 minutes (AR 285) but then told her cardiologist in 2015 that she "[w]alks for 30 minutes few times a week without symptoms" (AR 535) is a clear and convincing reason to discredit Plaintiff's subjective symptom testimony.

Plaintiff argues that the fact that she denied back pain and fibromyalgia

symptoms during one November 2015 cardiology appointment (AR 535) is meaningless because she endorsed pain at other medical appointments and her cardiologist was not treating her for pain. (JS at 17.) These arguments do not diminish the inconsistency in Plaintiff's testimony.

Regarding Plaintiff's decision to decline "typical" medication for fibromyalgia, Plaintiff argues that it also means nothing because she was already taking Norco. (Id.) The ALJ's point, however, was that Plaintiff alleged she was suffering from disabling symptoms of fibromyalgia. AR 51 (alleging her "mind is constantly thinking about how to get rid of the pain") and AR 86 (alleging "Fibro Fog" rendered her "unable to think straight, forgetful, unable to concentrate"). In 2015, she declined taking "typical" medication for that condition, preferring Norco. AR 734. By the date of the hearing in 2018, she was still just taking Norco. AR 47. If Plaintiff's fibromyalgia were truly as disabling as she claimed, and Norco was not successful at suppressing her "extreme" and "constant" pain (AR 47) for three years, then one would expect her to be willing to try one of the "typical" medications to see if it might help. Thus, the ALJ has provided another clear and convincing reason supported by substantial evidence.

## V.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED: August 13, 2020

_____
KAREN E. SCOTT
United States Magistrate Judge